UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KIONTAY SMITH,

    Plaintiff,

v.   CAUSE NO. 3:23cv269 DRL

KITTLE PROPERTY GROUP, INC.,

    Defendant.

## OPINION AND ORDER

Following her termination from Kittle Property Group, Inc., Kiontay Smith filed a charge with the Equal Employment Opportunity Commission and then this suit. She alleges that Kittle discriminated against her by terminating her employment and requiring her to vacate her housing within seven days. After the court's motion to dismiss ruling, she maintains claims for race and sex discrimination under Title VII of the Civil Rights Act and wrongful eviction under the Fair Housing Act (FHA). Kittle requests summary judgment. The court grants the motion.

## BACKGROUND

Kittle Property Group constructs and manages apartment home complexes [40-1 ¶ 3]. Kittle hired Kiontay Smith in February 2021 as a full-time maintenance technician at its Canterbury House property in Warsaw, Indiana [40-4 Tr. 45-46]. She lived at the property before working there [*id.* Tr. 35].

When Ms. Smith began her employment, she signed an addendum to her lease providing that, "Employees have 7 days to vacate the premises upon termination unless both parties mutually agree the former employee can continue to reside at the community and they income

qualify to reside there. A new lease is signed with the updated rental rate and employee addendum removed" [40-8 Tr. 33-34; 40-9]. Employees must sign the addendum to receive a 20 percent discount on rent, and Ms. Smith received the discount after signing on March 19, 2021 [40-8 Tr. 35-36; 40-9].

In December 2021, while on medical leave, Ms. Smith was involved in two confrontations with a resident over parking spaces [48-1 ¶ 22, 33-35]. The first happened in early December, when she returned home from the emergency room to find that her neighbor, a Caucasian female, had three cars (two of hers and one for a guest) parked in the spaces in front of the building [*id.* ¶ 19, 22]. Ms. Smith is a bisexual African-American woman [40-4 Tr. 134]. There weren't any available parking spaces near the building; and, because Ms. Smith was ill and with her infant, she wanted to park close to the building [48-1 ¶ 22-24]. She says she knocked on her neighbor's door around 8:00 p.m. and asked her to move one of her vehicles, and her neighbor moved a car [*id.* ¶ 26, 29]. She says no one, including her supervisor, Stephanie Beckel, told her that her behavior was out of line or that there were no assigned parking spaces [*id.* ¶ 31-32].

On December 16, Ms. Smith, still sick and again with her child, returned home to the same neighbor parked in three parking spaces [*id.* ¶ 33]. She says she went to her neighbor's apartment around 8:30 p.m. to ask her to move a car, but her neighbor yelled and cussed at her [*id.* ¶ 35-36]. Ms. Smith reports complaining to the office the next day, but she says her supervisor did not tell her that her behavior was inappropriate or otherwise discipline her [*id.* ¶ 39-42].

Ms. Smith returned to work from medical leave on December 20, 2021 [*id.* ¶ 45]. That morning, Michelle Clevenger, the regional manager, told Ms. Smith that she was terminated and had her escorted out of the office by two Warsaw police officers [*id.* ¶ 49, 57; 40-8 Tr. 11]. Ms.

Smith claims that Ms. Clevenger didn't explain the firing, only telling her that as a Kittle employee, she needed to act like one [48-1 ¶ 50]. Ms. Smith was also told that morning that she had seven days to vacate her apartment; and, when she reached out to human resources about it, they told her Ms. Clevenger had made the decision [*id.* ¶ 52, 56]. She and her wife and son had to move out of their apartment Christmas week [*id.* ¶ 59].

Kittle tells a different story. The property manager and supervisor, Ms. Beckel, informed the company that Ms. Smith had been making threats of gun violence to other residents at the property [40-8 Tr. 29; 40-11 Tr. 38]. The company says Ms. Smith told Ms. Beckel that the neighbor was "lucky" that Ms. Smith didn't have the gun she carries because she didn't know what would have happened if things had gotten "ugly" [40-2]. The regional director, Ms. Clevenger, noted that Ms. Smith made essentially the same gun comment "at least 3 different times in 3 different ways" [*id.*]. The neighbor told Ms. Beckel that she heard Ms. Smith tell another neighbor that she was going to "beat her ass" [*id.*]. The employee handbook states clearly that the company "does not allow behavior at any time that threatens, intimidates, bullies, or coerces another employee, a resident, or a member of the public" [48-12 at KPG000213].

Ms. Beckel reported these incidents to Ms. Clevenger, who informed the regional vice-president, Telisia Amaning [40-8 Tr. 29; 40-11 Tr. 8; 48-10]. After discussing it with Ms. Clevenger, Ms. Amaning then recommended termination to senior vice-president Steve Lavery [40-11 Tr. 58-59]. Mr. Lavery made the final decision to terminate Ms. Smith, and he testified that no employee at Kittle has ever threatened gun violence against residents without being dismissed [40-13 ¶ 3-4].

Ms. Smith denies the threats [48-1 ¶ 43] and alleges the company wrongfully terminated her based on her race and sex, including sexual orientation, in violation of Title VII and wrongfully evicted her in violation of the FHA. Kittle argues that no genuine triable issue remains, and that the company is entitled to judgment as a matter of law.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

A. *Title VII.*

Title VII prohibits a qualifying employer from "discharg[ing] any individual . . . because of such individual's race [or] . . . sex." 42 U.S.C. § 2000e-2(a)(1). The law uses a holistic approach that poses a singular question at summary judgment: whether the evidence would permit a reasonable factfinder to conclude that Ms. Smith's sex, including sexual orientation, or race caused her termination. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The court considers the evidence as a whole. *Id.*

That said, "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "There is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor." *Johnson*, 892 F.3d at 894.

Under the *McDonnell Douglas* framework, Ms. Smith must demonstrate that (1) she is a member of a protected class, (2) she met Kittle's legitimate expectations, (3) she suffered an adverse employment action despite her reasonable performance, and (4) similarly situated employees who were not members of her protected class were treated more favorably. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (applying framework post-*Ortiz*); *see also Cunningham v. Austin*, 2025 U.S. App. LEXIS 138, 8 (7th Cir. Jan. 3, 2025) (proceeding under the *McDonnell Douglas* framework because the parties did). If she meets her

5

burden on each element of her *prima facie* case, the burden shifts to Kittle "to articulate a legitimate, nondiscriminatory reason for the adverse employment action;" if Kittle carries that burden, the burden shifts back to Ms. Smith to present evidence that Kittle's explanation is pretextual. *McDaniel,* 940 F.3d at 368.

Kittle does not contest that Ms. Smith is a member of a protected class, that she suffered an adverse employment action, or that, outside of the alleged threat, she met legitimate employment expectations. Instead, Kittle contends only that Ms. Smith hasn't identified a similarly situated coworker outside her protected class that Kittle treated differently. Ms. Smith argues both that she has comparators and that Kittle's reason for terminating her was pretextual.

   1. *Comparators.*

For Ms. Smith to make a *prima facie* case using comparators, she must designate evidence for a reasonable jury to find that Kittle treated similarly situated employees outside her protected class more favorably. *McDaniel,* 940 F.3d at 369 ("As [the plaintiff] has not identified any similarly situated employees to allow a factfinder to conduct a meaningful comparison, [her] prima facie case for discrimination fails."). Similarly situated employees must be "directly comparable" to the plaintiff in all material respects. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012).

The comparator prong aims "to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *McDaniel*, 940 F.3d at 368 (quotations omitted). Ms. Smith must show at a minimum that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the

6

employer's treatment of them," *id.* at 369 (quotations and citation omitted), though this isn't a "hard and fast test," *Johnson*, 892 F.3d at 895.

"Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met [her] burden on this issue." *McDaniel*, 940 F.3d at 369. The critical question is whether the plaintiff has shown that she would have kept her job, had she had she not been a member of the protected class, if "everything else had remained the same." *Nigro v. Ind. Univ. Health Care. Assocs.*, 40 F.4th 488, 491 (7th Cir. 2022). The analysis requires a "common sense examination." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013).

Ms. Smith advances two arguments. First, she says her replacement was a white male, which she argues establishes a *prima facie* case. She cites *Echols v. Select Bevs., Inc.*, 64 F. Supp.2d 807, 813 (S.D. Ind. 1998), for the proposition that she can establish her opening case by pointing to her replacement as "a person of a different race." But in *Echols*, the plaintiff established a *prima facie* case by pointing to his replacement *and* that a similarly situated individual outside the protected class was treated differently, not just his replacement's identity. The fact that "one's replacement is of another race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996). The question is "whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground." *Id.* Stating her replacement's identity alone falls short of satisfying Ms. Smith's burden.

Second, Ms. Smith points to three comparators. She identifies Scott Flannery, whom she says was insubordinate and had an allegedly racist bumper sticker on his car; Dwayne Alexander,

whom she says entered into a resident's home while she was sleeping; and Michael Loper, whom she says was insubordinate. Each of these comparators, she says, are Caucasian, heterosexual men, and none were immediately terminated as she was. Kittle denies that these three men are similarly situated. The court agrees with Kittle.

First, none of Ms. Smith's suggested comparators filled the same role under the same supervisors. Mr. Flannery and Mr. Alexander worked as maintenance supervisors, a different role than Ms. Smith's maintenance technician position [54-1 Tr. 55; 54-2 ¶ 5; 54-3 Tr. 28]. Kittle argues that this is critical difference. The law emphasizes that "supervisors usually make poor comparators for plaintiffs claiming employment discrimination," but "usually does not mean always." *Rodgers v. White*, 657 F.3d 511, 517-18 (7th Cir. 2011). Supervisors aren't good comparators in cases with promotional disputes or dissimilar job duties, but "when uneven discipline is the basis for a claim of discrimination, the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Id.* at 518. When a plaintiff and supervisor are "accused of making similar mistakes, [are] equally responsible for avoiding those mistakes, and [are] disciplined by the same supervisor, the plaintiff can make a realistic comparison with h[er] supervisor for purposes of establishing a prima facie case of discrimination." *Id.*

This is a case focused on conduct resulting in termination, so the initial difference in job titles isn't as persuasive as it might otherwise be; instead, the court looks beyond titles to the mistakes and ultimate supervisors. The comparators don't withstand this more detailed examination. Kittle doesn't provide evidence that Mr. Flannery didn't have the same ultimate supervisors as Ms. Smith, but Mr. Alexander and Mr. Loper didn't. Mr. Alexander's misconduct

occurred before Ms. Clevenger and Ms. Amaning, two key figures in Ms. Smith's dismissal, were in management, and neither even knew Mr. Alexander [54-3 Tr. 28; 54-4 Tr. 34]. Mr. Lavery, Ms. Clevenger, and Ms. Amaning didn't have the same titles when Mr. Loper's employment ended either [40-11 Tr. 12; 40-12 Tr. 7], although Mr. Loper was working as a maintenance tech like Ms. Smith [48-2 ¶ 8]. Ultimately, none of Ms. Smith's comparators served in the same role and had the same supervisors, so initially all the comparators are incongruous on some level.

The most significant difference between Ms. Smith and these comparators, however, isn't their roles or their supervisors, but whether they were "engaged in similar conduct without [] differentiating or mitigating circumstances." *McDaniel*, 940 F.3d at 369. Her claim fails if none of her comparators were "engaged in conduct of comparable seriousness." *Nigro*, 40 F.4th at 491 (quoting *Reives v. Ill. State Police*, 29 F.4th 887, 892 (7th Cir. 2022)). The court must ask whether a reasonable jury, on this record, could look at these comparators' conduct and find it similar to what Kittle believes Ms. Smith did here. While maintaining her denial that she ever made threats, Ms. Smith admits that Ms. Clevenger reported that she had made threats of gun violence to a resident to the regional vice president [47 ¶ 26], and she points to no evidence suggesting that Mr. Lavery, the ultimate decisionmaker, would have had reason to believe that information was false [*id.* ¶ 38]. She also makes no arguments and provides no evidence to indicate that Ms. Amaning or Ms. Clevenger would have known or believed the report to be false. That leaves the undisputed conclusion that the decisionmakers had information, whether ultimately true or not, that Ms. Smith had threatened a resident with a gun.

A reasonable jury could not look to Ms. Smith's suggested comparators and find them to have engaged in similar conduct while receiving more favorable treatment, not forgetting the

9

employee handbook's statement that the company "does not allow behavior at any time that threatens, intimidates, bullies, or coerces another employee, a resident, or a member of the public" [48-12 at KPG000213]. *See Nigro*, 40 F.4th at 491-92 (employee who fails this prong has "no way to isolate the critical independent variable—discriminatory animus"). First, Ms. Smith points to Mr. Flannery, whom she says was "insubordinate" and had a "racist bumper sticker on his truck" [50 at 11-12]. Ms. Clevenger, the supervisor, directed Mr. Flannery to cover the bumper sticker at work, but she didn't address any of the other concerns [48-3 ¶ 10-12]. Management undoubtedly handled the problems differently, but no reasonable jury could conclude that insubordination and an inappropriate bumper sticker mirrored a threat of gun violence; those are not a "comparable set of failings." *Rodgers*, 657 F.3d at 520; *see also Jones v. Union Pac. R.R.*, 302 F.3d 735, 745 (7th Cir. 2002) (altercation with fellow employee and insubordination was an "unusable comparison").

Second, Ms. Smith points to Mr. Alexander. She accuses Mr. Alexander of entering the home of another resident while she was sleeping. Ms. Smith doesn't point to any record evidence about Mr. Alexander.[1] Instead, she merely asserts that he was placed on a paid suspension while the company conducted a full investigation before terminating him in her brief. Ms. Smith doesn't have to prove discrimination at this stage, and the court takes all inferences in the light most favorable to her, but without any evidence at all regarding Mr. Alexander, a reasonable jury has no basis to evaluate whether he is an appropriately similar comparator, much less to conclude that he is one. *See Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 631 (7th Cir. 2018) (plaintiff needed

---

[1] The only mention of Mr. Alexander is that he was present in a meeting to discuss Mr. Loper's performance issues [48-2 ¶ 10]. The company acknowledged that Mr. Alexander was discharged for cause, but that is the only information the court has found on the record [48-14 at 3].

to present evidence of discrimination); *see also McCann v. Badger Mining Corp.*, 965 F.3d 578, 592 (7th Cir. 2020) (plaintiffs must present affirmative evidence to defeat summary judgment).

Third, Ms. Smith targets Mr. Loper, who "excessively used his phone while he was supposed to be working," didn't work when he was supposed to, and yelled and threw keys at a supervisor during a meeting [48-2 ¶ 9-10]. Once again, no reasonable jury could find this comparable to a threat of gun violence. *See Rodgers*, 657 F.3d at 517. Mr. Loper's job performance and respect for supervisors left much to be desired on this record, but it doesn't present the kind of immediate concern as a threat of violence. This is not conduct of comparable seriousness. *See Coleman*, 667 F.3d at 850-51 (threats of violence similar); *Neal v. Ind. Gaming Co., L.P.*, 2009 U.S. Dist. LEXIS 121630, 27-28 (S.D. Ind. Dec. 31, 2009) (threat of violence different from disciplinary records).

Ms. Smith cannot point to any other employees who made threats of gun violence and were allowed to remain employed [47 ¶ 36] to contradict Mr. Lavery's assertion that Kittle has never treated anyone accused of making a threat of gun violence differently [40-13 ¶ 4]. And she doesn't designate any evidence of comparable conduct being treated differently. She cannot establish a *prima facie* case of discrimination based on comparator analysis.

    2. *Pretext.*

Nor can she establish for a reasonable jury that Kittle's reason for firing her—reported threats of gun violence—was pretextual. When analyzing pretext, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Perez*, 731 F.3d at 708. The "question is never whether the employer was mistaken, cruel, unethical, out of his head, or downright irrational in

11

taking the action for the stated reason, but simply whether the stated reason was his reason: not a good reason, but the true reason." *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418 (7th Cir. 2006) (emphasis omitted). Pretext requires a "deliberate falsehood," but an "honest mistake, however dumb, is not" pretextual. *Id.* at 419. The court doesn't look to the factual basis of the employer's belief; instead, the "only concern in reviewing an employer's reasons for termination is the honesty of the employer's beliefs." *Id.* (quoting *Balderston v. Fairbanks Morse Engine Div.*, 328 F.3d 309, 323 (7th Cir. 2003)).

In short, if the decisionmaker believed, rightly or wrongly, that Ms. Smith made threats of gun violence, the reason wasn't pretextual. *Naik v. Boehringer Ingelheim Pharms.*, 627 F.3d 596, 601 (7th Cir. 2010). The pretext analysis "focuses only on what the decisionmaker, and not anyone else, sincerely believed." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). Ms. Smith bears the burden of providing evidence of pretext. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 824 (7th Cir. 2006); *accord Cunningham*, 2025 U.S. App. LEXIS 138 at 11. It is a "high evidentiary bar." *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 894 (7th Cir. 2016).

Ms. Smith first disputes the underlying reason for termination—the fact that she made a threat—not whether decisionmakers at Kittle actually believed it. She invites the court to evaluate the case based on a showing that Kittle's reason was "unworthy of credence," citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001), but this was explicitly rejected as a test in *Forrester*, 453 F.3d at 418-19 (saying this would "tacitly effect a fundamental change in settled law"). The court won't use a long-rejected test to evaluate whether Ms. Smith actually made the threat here (nor on this record could the reason be called unworthy of any credence). The court's

only job is determining whether she has designated evidence for a reasonable jury to conclude that the decisionmakers at Kittle did not believe that she had threatened a resident.

Ms. Smith next argues that the reason for discharging her was pretextual because Kittle treated individuals outside her protected class more favorably and that Kittle gave shifting reasons for terminating her. She claims that she has "presented specific evidence" of pretext, but the court struggles to see what her brief claims, and she provides no assistance. The court has already determined that Ms. Smith hasn't presented the court with any similarly situated individuals who were treated differently after comparable behavior, and Ms. Smith gives the court no reason to reconsider that analysis.

Ms. Smith correctly notes that a jury could "reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). The problem for Ms. Smith here is that Kittle has maintained throughout the litigation that it terminated her employment due to reports that she had threatened another resident. This directly contrasts with *Appelbaum*, where the defendant cited performance initially before saying at trial that it played "zero role" in the plaintiff's termination. *Id.* Had Kittle initially claimed to terminate Ms. Smith for performance and then pivoted to its concern about a threat, perhaps the analysis might change, but Ms. Smith doesn't point to any evidence that Kittle changed its position during the litigation or after her termination. She notes that months before her termination, Ms. Clevenger wanted to fire her for not being a good worker, but she wasn't fired then. She was fired for threats of gun violence [40-8 Tr. 29]. No reasonable jury could conclude that Ms. Clevenger's statement from months earlier

13

was truly the reason for firing rather than the reported threat, particularly when the ultimate decision was made by someone much higher up in the company.

Ms. Smith also argues that Kittle has wavered on who the ultimate decisionmaker was. She claims the company initially said that Ms. Amaning, Ms. Clevenger, and Mr. Lavery all made the decision in its EEOC position statement, before claiming in its interrogatory answers that only Ms. Amaning and Ms. Clevenger made the decision, and to now saying Mr. Lavery made the decision. Kittle clarifies that all three had roles in the process, that Ms. Clevenger and Ms. Amaning made recommendations to terminate, and Mr. Lavery made the final decision [40-12 Tr. 16-17]. Nothing strikes as so inconsistent that a reasonable jury could find this to be evidence that the reason behind her termination was pretextual. In fact, Mr. Lavery testified that he didn't even know Ms. Smith's race or sexual orientation when he made the decision to terminate her, undermining any idea of pretext [*id.* Tr. 26]. Ms. Smith doesn't provide any evidence for a jury to doubt that the decisionmakers believed that she had threatened a resident. She hasn't met her "high evidentiary bar." *Riley*, 829 F.3d at 894.

Ms. Smith has not established a *prima facie* case of discrimination, nor has she pointed to anything that would allow a reasonable jury to conclude that Kittle's reason for firing her was pretextual. The court likewise has examined this record holistically to determine whether the record would "permit a reasonable factfinder to conclude that [her] race, ethnicity, sex, religion, or other proscribed factor caused the discharge." *Ortiz*, 834 F.3d at 765. Nothing tends to overlay a legitimate decision to terminate someone for reports of threatened gun violence with a discriminatory intent, or demonstrate to a reasonable jury that the company treated Ms. Smith

14

differently based on such reports as compared to others who were a different race, gender, or sexual orientation. The court must grant summary judgment for Kittle on her Title VII claims.

    B. *Fair Housing Act (FHA).*

Ms. Smith brings multiple claims under the FHA, which Congress passed so that "no one is denied the right to live where they choose for discriminatory reasons." *Bloch v. Frischolz*, 587 F.3d 771, 776 (7th Cir. 2009). She cites both 42 U.S.C. § 3604(a) and § 3604(b), and then also § 3167. Although the parties debate whether Ms. Smith pleaded a § 3167 claim, the court assumes she has properly pleaded it because her claim fails on the merits.

Section 3604(a) makes it unlawful for an entity "[t]o refuse to…rent…or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It applies even after someone has acquired the property and covers discriminatory evictions. *Watters v. Homeowners' Ass'n*, 48 F.4th 779, 785 (7th Cir. 2022). Section 3604(b) makes it unlawful for an entity "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling…because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). These sections "prohibit discriminatory evictions." *Bloch*, 587 F.3d at 782.

Ms. Smith also cites § 3167, which "reaches a broader range of post-acquisition conduct," including "coercion, intimidation, threats, and interference." *Id.* To prevail on this particular claim, she must show that "(1) she is a protected individual under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) the defendants coerced, threatened, intimidated, or interfered with the plaintiff on account of her protected activity under the FHA, and (4) the defendants were motivated by an intent to discriminate." *Bloch*, 587 F.3d at 783.

15

The debated prerequisite to her claims is whether a reasonable jury could find that Kittle was motivated by an intent to discriminate. The law treats the FHA analysis much the same as Title VII. *See Watters,* 48 F.4th at 788 (citing cases). She can establish a discriminatory intent "through the inferential burden shifting method known as the *McDonnell Douglas* test." *Kormoczy v. Sec'y, United States Dep't of Hous. & Urban Dev.*, 53 F.3d 821, 823-24 (7th Cir. 1995).[2] "[O]nce the plaintiff demonstrates disparate treatment…a defendant must prove by a preponderance of the evidence that it would have made the same decision absent the impermissible factor." *Id.* at 824. Prophylactically, the court also considers the record holistically to see whether a reasonable factfinder could find that Kittle acted with discriminatory intent.

Kittle concedes that Ms. Smith belongs to two protected classes and experienced an adverse action (her eviction), but it argues that, like her Title VII claim, she cannot point to any similarly situated individuals outside her protected class that Kittle treated differently. Both FHA provisions require Ms. Smith to provide evidence demonstrating discriminatory intent. *Bloch*, 587 F.3d at 784; *see also Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 715 (7th Cir. 1998). The *McDonnell Douglas* test allows her to do this by pointing to similarly situated individuals who were treated differently. *Kormoczy*, 53 F.3d at 823-24.

Ms. Smith relies on comparators to argue that under *McDonnell Douglas* she has shown discrimination and that Kittle provided only a pretextual reason for evicting her.[3] She points to

---

[2] Understanding that *Ortiz*, 834 F.3d at 765, established that courts should not bifurcate the evidence into indirect and direct buckets, the court proceeds under *McDonnell Douglas* without dividing the evidence the way *Ortiz* forbids. *See Watters*, 48 F.4th at 789 (applying the analysis in the FHA context).

[3] Ms. Smith's brief simply concludes, without more explanation, that all three individuals were terminated, but only Ms. Smith was told to vacate the premises within seven days, "[t]hus the reason for evicting Ms. Smith is pretext." This is not an argument that Kittle's reason was pretextual, but merely a conclusion drawing on her view of the comparator analysis, so the court won't restate its prior pretextual analysis beyond analyzing the comparators.

two Kittle employees (Michael Loper and Josh Neal) who were also residents—both of whom she claims are male, Caucasian, and heterosexual. From the beginning, even Ms. Smith recognizes one key difference between her and these individuals: Mr. Loper and Mr. Neal both resigned,[4] whereas she was terminated. Nevertheless, Ms. Smith names these two as FHA comparators, and she says both were allowed to stay in their residences, though Kittle's policy should have resulted in their evictions within the seven-day lease agreement period.

Kittle responds that these are not true comparators. The court agrees. Ms. Smith cannot point to any other examples of employees threatening gun violence, and she doesn't even provide the court with any examples of individuals Kittle terminated. This is a key missing piece from Ms. Smith's case—she must provide evidence for a reasonable jury to find that her comparators "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *McDaniel*, 940 F.3d at 369. Mr. Neal gave his two weeks' notice and failed to complete the two weeks [48-2 ¶ 12-13]. Mr. Loper yelled expletives and threw his keys at a supervisor before not putting in his two weeks [*id.* ¶ 10-11]. Neither were eligible for rehire, and neither signed a new lease agreement after their employment ended [*id.* ¶ 11, 13, 14]. Ms. Smith argues that because the company chose not to apply the lease addendum requiring Mr. Neal or Mr. Loper to vacate within seven days, she has established Kittle's discriminatory intent.

Ms. Smith jumps to the result—whether they were allowed to stay past the seven-day mark—without considering the conduct. Improper resignation protocol and insubordination are

---

[4] The employee handbook deems employees terminated when they resign or fail to report to work for three consecutive days [48-12 at KPG000206], so Ms. Smith is correct that these employees were technically terminated. The court highlights resignation only as a distinguishing factor from being fired for inappropriate conduct.

markedly different from threats of gun violence; and, whether Ms. Smith actually made the threats or not, the company received reports that she had made those threats three different ways [40-12 Tr. 17; 48-13]. And Ms. Smith points to no evidence suggesting that the decisionmakers doubted the reports.

Kittle also argues that Mr. Loper and Mr. Neal both dealt with different decisionmakers than Ms. Smith. *McDaniel*, 940 F.3d at 369. Ms. Smith denies this, and she suggests the company has no decisionmakers. The provision in the employee lease, which Ms. Smith signed, says employees "have 7 days to vacate the premises upon termination, unless both parties mutually agree the former employee can continue to reside at the community and they income qualify to reside there" [48-4 at KPG000109]. This addendum presupposes mutual agreement. There is no dispute the company used the provision to evict Ms. Smith following her termination. After all, the human resources director, Alysia Coulmont, sent Ms. Smith the "Notice to Vacate" on December 27, 2021 [48-9]. The real dispute is over whether the circumstances are comparable.

Kittle explains that Mr. Neal isn't an adequate comparator for eviction because he lived in a qualified tax unit not governed by a standard lease agreement, so the company couldn't require him to vacate [54-2 ¶ 8]. This makes him differently situated than Ms. Smith because the provision the company used to terminate Ms. Smith's lease didn't apply—the company didn't choose not to use the provision; it didn't have the option. That leaves Mr. Loper as the only employee with the same addendum. Ms. Amaning, the decisionmaker for Ms. Smith's eviction, didn't allow exceptions to the policy, so Ms. Smith was told to vacate [49-3 Tr. 24]. She was not the regional vice-president when Mr. Loper resigned in 2020, so her practice of not allowing exceptions wasn't in place, and a different regional vice-president may have approached the policy

18

differently [40-11 Tr. 12].[5] Different supervisors, and thus different practices, particularly when it rests on both parties reaching an agreement, make Mr. Loper a dissimilar comparator, even beyond the different conduct here. *McDaniel*, 940 F.3d at 369.

Kittle provides a legitimate reason for evicting Ms. Smith. Even examining the record holistically, she doesn't point to any evidence for a reasonable jury to find discriminatory motive or intent in action, whether in the decision to evict or not to reach mutual agreement about continued residency. She hasn't met her burden to establish discrimination under the FHA, so the court grants summary judgment for Kittle on these claims too.

## CONCLUSION

Accordingly, the court GRANTS Kittle's summary judgment motion on all claims [39]. This order terminates the case.

SO ORDERED.

January 27, 2025                               s/ *Damon R. Leichty*
                                                              Judge, United States District Court

---

[5] Ms. Amaning was the regional vice-president overseeing Ms. Smith's region (Region 2, encompassing CHA-Warsaw LLP) between mid-2021 and early 2023 [40-11 Tr. 12]. Mr. Loper resigned in 2020 [40-12 Tr. 21].